**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHARLES WOMACK, | Case No. |
| Plaintiff, | JURY TRIAL DEMANDED |
| vs. | |
| SANOFI US SERVICES INC.; SANOFI AVENTIS U.S. LLC; BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.; CHATTEN, INC.; GLAXOSMITHKLINE, LLC; and DOES 1-100. | **COMPLAINT** |
| Defendants. | |

## INTRODUCTION

1.      N-Nitrosodimethylamine ("NDMA") is a potent carcinogen.  It used to be a chemical biproduct of making rocket fuel in the early 1900s but, today, its only use is to induce  tumors in animals as part of laboratory experiments.  Its *only* function is to cause cancer.  It has  no business being in a human body.

2.      Zantac (chemically known as ranitidine), the popular antacid medication used daily by  millions of people, leads to the production of staggering amounts of NDMA when it is  digested by the human body.  The U.S. Food and Drug Administration's ("FDA") allowable   daily limit of NDMA is 92 ng (nanograms) and yet, in a single dose of Zantac, researchers are  discovering over 3 million ng.

3.      These recent revelations by independent researchers have caused widespread   recalls of Zantac both domestically and internationally, and the FDA is actively investigating the  issue, with preliminary results showing "unacceptable" levels of NDMA.

4.      To be clear, this is not a contamination case—the levels of NDMA that

researchers are seeing in Zantac is not the product of some manufacturing error.  The high levels  of NDMA observed in Zantac are a function of the ranitidine molecule and the way it breaks  down in the human digestive system.

5.       Plaintiff Charles Womack was prescribed and took Zantac for several years and as a result was diagnosed with colorectal cancer in December 2014.  Plaintiff's cancer was caused by NDMA exposure created by the ingestion  of Zantac.  This lawsuit seeks damages against the Defendants for causing Plaintiff's cancer.

## PARTIES

6.       Plaintiff Charles Womack ("Plaintiff") is a natural person currently residing in Texarkana, Texas.

7.       Defendant Sanofi S.A. is a French multinational  vertically  integrated pharmaceutical company headquartered in Paris, France, with its principal place of business located at 54, Rue La Boetie, in the 8th arrondissement.

8.       Defendant Sanofi US Services Inc., is a Delaware corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is  a wholly-owned subsidiary of Sanofi S.A.  Sanofi controlled the New Drug Application ("NDA")  for Zantac starting in January 2017 through the present.

9.       Defendant Sanofi-Aventis U.S. LLC., is a Delaware limited liability corporation with its  principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is  a wholly-owned subsidiary of Sanofi S.A.

10.      Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BI") is a Delaware corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877.  BI is a subsidiary of the German company Boehringer Ingelheim Corporation.  BI owned the U.S. rights to both prescription and over-the-counter ("OTC")

Zantac between December 2006 and January 2017, and manufactured and distributed the drug in the United States during that period.

11.    Defendant Chattem, Inc. ("Chattem") is a Tennessee corporation with its principal place of business located at 1715 West 38th Street, Chattanooga, Tennessee 37409. Chattem is a wholly-owned subsidiary of Sanofi S.A., a French multinational corporation.

12.    Defendants Sanofi S.A., Sanofi-Aventis U.S. LLC; Sanofi US Services Inc.; and Chattem, Inc. (collectively "Sanofi" or "Sanofi Defendants") controlled the U.S. rights to brand name Zantac from about January 2017 to the present, and manufactured and distributed the drug in the United States during that period.

13.    Defendant GlaxoSmithKline, LLC ("GSK") is a Delaware corporation with its principal place of business located at 5 Crescent Drive, Philadelphia, Pennsylvania, 19112 and Five Moore Drive, Research Triangle, North Carolina, 27709. GSK was the original innovator of the Zantac drug and controlled the NDA for prescription Zantac between 1983 and 2009. By controlling the Zantac NDA, it also directly controlled the labeling for all Zantac products through 2009. GSK's negligence and misconduct related to Zantac as an innovator directly led to the failure to warn for other OTC versions of Zantac.

14.    At all times relevant hereto, Zantac and/or its generic ranitidine was manufactured, designed, tested, packaged, labeled, marketed, advertised, distributed, and sold by Defendant Sanofi, Boehringer, GSK, and the DOES 1 through 100. Plaintiff has exercised due diligence to specifically identify the fictitious defendants during the period of limitations applicable to this cause, but has not succeeded in that effort at the time this Complaint was filed.

15.     Upon information and belief, the Sanofi Defendants, Boehringer, GSK, and Does 1 through 100 acted together to design, sell, advertise, manufacture and/or distribute Zantac and /or its generic ranitidine, with full knowledge of its dangerous and defective nature.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties.  In addition, Plaintiff seeks damages in  excess of $75,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over each Defendant insofar as each Defendants is authorized and licensed to conduct business in the State of New Jersey, maintains and carries on systematic and continuous contacts in this judicial district, regularly transacts  business within this judicial district, and regularly avails itself of the benefits of this judicial  district.

18.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to this claim occurred within this judicial  district and Defendant Sanofi is a resident of the state of New Jersey.

## FACTUAL ALLEGATIONS

**I.      Brief History of Zantac and Ranitidine**

19.     Zantac was developed by GlaxoSmithKline ("GSK") and approved for prescription use by the FDA in 1983.  The drug belongs to a class of medications called histamine H2-receptor antagonists (or H2 blockers), which decrease the amount of acid produced by the stomach and are used to treat gastric ulcers, heartburn, acid indigestion, sour stomach, and  other gastrointestinal conditions.

20.     Due in large part to GSK's marketing strategy, Zantac was a wildly

successful drug, reaching $1 billion in total sales in December 1986. As one 1996 article put it, Zantac became "the best-selling drug in history as a result of a shrewd, multifaceted marketing strategy that . . . enabled the product to dominate the acid/peptic marketplace."[1]   Significantly, the marketing strategy that led to Zantac's success emphasized the purported safety of the drug.

21.    Zantac became available without a prescription in 1996, and generic versions of the drug (ranitidine) became available the following year. Although sales of brand-name Zantac declined as a result of generic and alternative products, Zantac sales have remained strong over time. As recently as 2018, Zantac was one of the top ten antacid tablet brands in the United States, with sales of Zantac 150 totaling $128.9 million—a 3.1% increase from the previous year.

22.    On September 13, 2019, in response to a citizen's petition filed by Valisure, Inc. (discussed in detail below), U.S. and European regulators stated that they are reviewing the safety of ranitidine.

23.    On September 18, 2019, Novartis AG's Sandoz Unit, which makes generic drugs, stated that it was halting the distribution of its versions of Zantac in all markets, while Canada requested drug makers selling ranitidine to stop distribution.

24.    On September 28, 2019, CVS Health Corp. stated it would stop selling Zantac and its own generic ranitidine products out of concern that it might contain a carcinogen. CVS has been followed by Walmart, Inc., Walgreens Boot Alliance, and Rite Aid Corp., all of which removed Zantac and ranitidine products.

25.    On October 2, 2019, the FDA stated it was ordering all manufacturers of

---

[1] Wright, R., *How Zantac Became the Best-Selling Drug in History*, 1 J. HEALTHCARE MARKETING 4, 24 (Winter 1996).

Zantac and ranitidine products to conduct testing for NDMA and that preliminary results indicated unacceptable levels of NDMA so far.

26.     At no time did any Defendant attempt to include a warning about NDMA or any cancer, nor did the FDA ever reject such a warning.  Defendants had the ability to unilaterally  add an NDMA and/or cancer warning to the Zantac label (for both prescription and OTC)  without prior FDA approval pursuant to the Changes Being Effected regulation.  Had any  Defendant attempted to add an NDMA warning to the Zantac label (either for prescription or  OTC), the FDA would not have rejected it.

## II.     Dangers of NDMA

27.     NDMA is a semi-volatile organic chemical that forms in both industrial and natural processes.  It is a member of N-nitrosamines, a family of potent carcinogens.  The dangers that NDMA poses to human health have long been recognized.  A news article published  in 1979 noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[2]  NDMA is no longer produced or commercially used in the United States, except for research.   In other words, it is only a poison.

28.     Both the Environmental Protection Agency ("EPA") and the International Agency  for Research on Cancer ("IARC") have classified NDMA as a probable human carcinogen.   And  the World Health Organization ("WHO") has stated that scientific

---

[2] Jane Brody, *Bottoms Up: Alcohol in moderation can extend life*, THE GLOBE AND MAIL (CANADA) (Oct. 11, 1979); *see* Rudy Platiel, *Anger grows as officials unable to trace poison in reserve's water*, THE GLOBE AND MAIL CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because  testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct  chemical that has been linked to cancer"); Kyrtopoulos et al, *DNA adducts in humans after  exposure to methylating agents*, 405 MUTAT. RESEAR. 135 (1998) (noting that "chronic exposure  of rats to very low doses of NDMA gives rise predominantly to liver tumours, including tumors  of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

testing indicates NDMA  consumption is positively associated with either gastric or colorectal cancer and suggests that  humans may be especially sensitive to the carcinogenicity of NDMA.

29.    As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of  the FDA.

30.    Most recently, beginning in the summer of 2018, there have been recalls of several generic drugs used to treat high blood pressure and heart failure—Valsartan, Losartan, and Irbesartan—because the medications contained nitrosamine impurities that do not meet the  FDA's safety standards.  The FDA has established a permissible daily intake limit for the  probable human carcinogen, NDMA, of 96 ng (nanogram).  However, the highest level of  NDMA detected by the FDA in any of the Valsartan tablets was 20,190 ng per  tablet.   In the case of Valsartan, the NDMA was an impurity caused by a manufacturing defect,  and thus NDMA was present in only *some* products containing Valsartan.  Zantac poses a greater  safety risk than any of the recently recalled Valsartan tablets.  Not only is NDMA a byproduct of  the ranitidine molecule, itself, but the levels observed in recent testing show NDMA levels in  excess of 3,000,000 ng.

31.    Tobacco smoke also contains NDMA.  One filtered cigarette contains 5-43 ng of NDMA.

32.    In mouse studies examining the carcinogenicity of NDMA through oral administration, animals exposed to NDMA developed cancer in the kidney, bladder, liver, and lung.  In comparable rat studies, similar cancers were observed in the liver, kidney, pancreas, and  lung.  In comparable hamster studies, similar cancers were observed in the liver, pancreas, and   stomach.  In comparable guinea-pig studies, similar cancers were

observed in the liver and lung.   In comparable rabbit studies, similar cancers were observed in the liver and lung.

33.     In other long-term animal studies in mice and rats utilizing different routes of exposures—inhalation, subcutaneous injection, and intraperitoneal (abdomen injection)—cancer   was observed in the lung, liver, kidney, nasal cavity, and stomach.

34.     Alarmingly, Zantac is in the FDA's category B for birth defects, meaning it is  considered safe to take during pregnancy.  However, in animal experiments, for those animals  exposed to NDMA during pregnancy, the offspring had elevated rates of cancer in the liver and  kidneys.

35.     In addition, NDMA breaks down into various derivative molecules that, themselves, are associated with causing cancer.  In animal studies, derivatives of NDMA induced  cancer in the stomach and intestine (including colon).

36.     Research shows that lower levels of NDMA, i.e., 40 ng, are fully metabolized in  the liver, but high doses enter the body's general circulation.

37.     Numerous *in vitro* studies confirm that NDMA is a mutagen—causing mutations  in human and animal cells.

38.     Overall, the animal data demonstrates that NDMA is carcinogenic in all animal  species tested: mice, rats, Syrian golden hamsters, Chinese and European hamsters, guinea-pigs, rabbits,  ducks, mastomys, fish, newts, and frogs.

39.     Pursuant to the EPA cancer guidelines, "tumors observed in animals are generally assumed to indicate that an agent may produce tumors in humans."

40.      In addition to the overwhelming animal data linking NDMA to cancer, there are  numerous human epidemiological studies exploring the effects of dietary exposure to various   cancers.   And, while these studies (several discussed below)

consistently show increased risks of  various cancers, the exposure levels considered in these studies are a very small fraction—as  little as 1 millionth—the exposures noted in a single Zantac capsule, i.e., 0.191 ng/day (dietary) v. 304,500 ng/day (Zantac).

41.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure  with 220 cases, researchers observed a statistically significant 700% increased risk of gastric  cancer in persons exposed to more than 0.51 ng/day.[3]

42.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure  with 746 cases, researchers observed statistically significant elevated rates of gastric cancer in  persons exposed to more than 0.191 ng/day.[4]

43.    In another 1995 epidemiological case-control study looking at, in part, the effects  of dietary consumption on cancer, researchers observed a statistically significant elevated risk of  developing aerodigestive cancer after being exposed to NDMA at .179 ng/day.[5]

44.    In a 1999 epidemiological cohort study looking at NDMA dietary exposure with  189 cases and a follow up of 24 years, researchers noted that "*N*-nitroso compounds are potent  carcinogens" and that dietary exposure to NDMA more than doubled the risk of developing colorectal cancer.[6]

45.    In a 2000 epidemiological cohort study looking at occupational exposure of workers in the rubber  industry, researchers observed significantly increased risks for

---

[3] *Pobel et al, Nitrosamine, nitrate and nitrite in relation to gastric cancer: a case-control study in Marseille, France*, 11 EUROP. J. EPIDEMIOL. 67–73 (1995).

[4] *La Vecchia et al, Nitrosamine intake and gastric cancer risk*, 4 EUROP. J. CANCER. PREV. 469–474 (1995).

[5] *Rogers et al, Consumption of nitrate, nitrite, and nitrosodimethylamine and the risk of upper aerodigestive tract cance*r, 5 CANCER EPIDEMIOL. BIOMARKERS PREV. 29–36 (1995).

[6] *Knekt et al, Risk of Colorectal and Other Gastro-Intestinal Cancers after Exposure to Nitrate, Nitrite and N-nitroso Compounds: A Follow-Up Study*, 80 INT. J. CANCER 852–856 (1999)

NDMA  exposure for esophagus, oral cavity, pharynx, prostate, and brain cancer.[7]

46.     In a 2011 epidemiological cohort study looking at NDMA dietary exposure with  3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake  was significantly associated with increased cancer risk in men and women" for all cancers, and   that "NDMA was associated with increased risk of gastrointestinal cancers" including rectal  cancers.[8]

47.     In a 2014 epidemiological case-control study looking at NDMA dietary exposure   with 2,481 cases, researchers found a statistically significant elevated association between  NDMA exposure and colorectal cancer.[9]

## III.     How Ranitidine Transforms into NDMA Within the Body

48.     The high levels of NDMA produced by Zantac are not caused by a manufacturing  defect but are inherent to the molecular structure of ranitidine, the active ingredient in Zantac.  The ranitidine molecule contains both a nitrite and a dimethylamine ('DMA') group which are   well known to combine to form NDMA.  *See* Fig. 1.  Thus, ranitidine produces NDMA by "react[ing] with itself", which means that *every dosage and form of ranitidine*, including Zantac,  exposes users to NDMA.

---

[7] *Straif et al, Exposure to high concentrations of nitrosamines and cancer mortality among a cohort of rubber workers*, 57 OCCUP ENVIRON MED 180–187 (2000).

[8] *Loh et al, N-nitroso compounds and cancer incidence: the European Prospective Investigation into Cancer and Nutrition (EPIC)–Norfolk Study*, 93 AM J CLIN NUTR. 1053–61 (2011).
[9] *Zhu et al, Dietary N-nitroso compounds and risk of colorectal cancer: a case-control study in Newfoundland and Labrador and Ontario, Canada*, 111 BR J NUTR. 6, 1109–1117 (2014).

**Figure 1 –Ranitidine Structure & Formation of NDMA**



49.     The formation of NDMA by the reaction of DMA and a nitroso source (such as a  nitrite) is well characterized in the scientific literature and has been identified as a concern for   contamination of the American water supply.[10]   Indeed, in 2003, alarming levels of NDMA in   drinking water processed by wastewater treatment plants was specifically linked to the presence   of ranitidine.[11]

**Figure 2 –Mechanism for Decomposition of Ranitidine in NDMA**



---

[10] Ogawa et al, *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney*, 264 J. BIO. CHEM. 17, 10205-10209 (1989).
[11] Mitch et al, *N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review*, 20 ENV. ENG. SCI. 5, 389-404 (2003).

50.     The high instability of the ranitidine molecule was further elucidated in scientific studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for the breakdown of ranitidine were proposed, as shown in Figure 2 above.[12] These studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA in the environment of water treatment plants which supply many American cities with water.

51.     These studies did not appreciate the full extent of NDMA formation risk from ranitidine; specifically, the added danger of this drug having not only a labile DMA group but also a readily available nitroso source in its nitrite group on the opposite terminus of the molecule. Recent testing of NDMA levels in ranitidine batches are so high that the nitroso for NDMA likely comes from no other source than the ranitidine molecule itself.

52.     Valisure, LLC is an online pharmacy that also runs an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization ("ISO") – an accreditation which recognizes a laboratory's technical competence. Valisure's mission is to help ensure the safety, quality, and consistency of medications and supplements in the market. In response to rising concerns about counterfeit medications, generics, and overseas manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard assays to test every batch of every medication it dispenses.

53.     As part of its testing of Zantac, and other ranitidine products, in every lot tested, Valisure discovered exceedingly high levels of NDMA. Valisure's ISO 17025

---

[12] Le Roux et al, *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism*, 46 *Environ. Sci. Technol.* 20, 11095-11103 (2012).

accredited laboratory used FDA recommended GC/MS headspace analysis method FY19-005-DPA8 for the determination of NDMA levels. As per the FDA protocol, this method was validated to a lower limit of detection of 25 ng.[13] The results of Valisure's testing show levels of NDMA well above 2 million ng per 150 mg Zantac tablet, shown below in Table 1.

| Table 1.  Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol | | |
|---|---|---|
| **150 mg Tablets or equivalent** | **Lot #** | **NDMA per tablet (ng)** |
| Reference Powder* | 125619 | 2,472,531 |
| Zantac, Brand OTC | 18M498M | 2,511,469 |
| Zantac (mint), Brand OTC | 18H546 | 2,834,798 |
| Wal-Zan, Walgreens | 79L800819A | 2,444,046 |
| Wal-Zan (mint), Walgreens | 8ME2640 | 2,635,006 |
| Ranitidine, CVS | 9BE2773 | 2,520,311 |
| Zantac (mint), CVS | 9AE2864 | 3,267,968 |
| Ranitidine, Equate | 9BE2772 | 2,479,872 |
| Ranitidine (mint), Equate | 8ME2642 | 2,805,259 |
| Ranitidine, Strides | 77024060A | 2,951,649 |

54.     Valisure's testing shows, on average, 2,692,291 ng of NDMA in a 150 mg Zantac tablet. Considering the FDA's permissible limit is 96 ng, this would put the level of NDMA at **_28,000 times_** the legal limit. In terms of smoking, a person would need to smoke at least 6,200 cigarettes to achieve the same levels of NDMA found in one 150 mg dose of Zantac.

55.     Valisure, however, was concerned that the extremely high levels of NDMA

---

[13] US Food and Drug Administration. (updated 01/25/2019). Combined N-Nitrosodimethlyamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay, *FY19-005-DPA-S.*

observed in its testing were a product of the modest oven heating parameter of 130 °C in the FDA recommended GC/MS protocol. So, Valisure developed a low temperature GC/MS method that could still detect NDMA but would only subject samples to 37 °C, the average temperature of the human body. This method was validated to a lower limit of detection of 100 ng.

56.     Valisure tested ranitidine tablets by themselves and in conditions simulating the human stomach. Industry standard "Simulated Gastric Fluid" ("SGF" 50 mM potassium chloride, 85 mM hydrochloric acid adjusted to pH 1.2 with 1.25 g pepsin per liter) and "Simulated Intestinal Fluid" ("SIF" 50 mM potassium chloride, 50 mM potassium phosphate monobasic adjusted to pH 6.8 with hydrochloric acid and sodium hydroxide) were used alone and in combination with various concentrations of nitrite, which is commonly ingested in foods like processed meats and is elevated in the stomach by antacid drugs.

57.     Indeed, Zantac was specifically advertised to be used when consuming foods containing high levels of nitrates, like tacos, pizza, etc.[14]

58.     The results of Valisure's tests on ranitidine tablets in biologically relevant conditions demonstrate significant NDMA formation under simulated gastric conditions with nitrite present (*see* Table 2).

| Table 2.  Valisure Biologically relevant tests for NDMA formation | | |
|---|---|---|
| **Ranitidine Tablet Studies** | **NDMA (ng/mL)** | **NDMA per tablet (ng)** |
| Tablet without Solvent | Not Detected | Not Detected |
| Tablet | Not Detected | Not Detected |

---

[14] *See, e.g.*, https://www.ispot.tv/ad/dY7n/zantac-family-taco-night; https://youtu.be/jzS2kuB5_wg; https://youtu.be/Z3QMwkSUlEg; https://youtu.be/qvh9gyWqQns.

| Simulated Gastric Fluid ("SGF") | Not Detected | Not Detected |
|---|---|---|
| Simulated Intestinal Fluid | Not Detected | Not Detected |
| SGF with 10 mM Sodium Nitrite | Not Detected | Not Detected |
| SGF with 25 mM Sodium Nitrite | 236 | 23,600 |
| SGF with 50 mM Sodium Nitrite | 3,045 | 304,500 |

59.    Under biologically relevant conditions, when nitrites are present, staggeringly  high levels of NDMA are found in one dose of 150 mg Zantac, ranging between 245 and 3,100  times above the FDA-allowable limit.  In terms of smoking, one would need to smoke over 500  cigarettes to achieve the same levels of NDMA found in one dose of 150 mg Zantac at the 25 ng  level (over 7,000 for the 50 μg level).

60.    Antacid drugs are known to increase stomach pH and thereby increase the growth  of nitrite-reducing bacteria which further elevate levels of nitrite. This fact is well known and  even present in the warning labels of antacids like Prevacid (lansoprazole) and was specifically  studied with ranitidine in the original approval of the drug.  Thus, higher levels of nitrites in  patients regularly taking Zantac would be expected.

61.    In fact, NDMA formation in the stomach has been a concern for many years and  specifically ranitidine has been implicated as a cause of NDMA formation by multiple research  groups, including those at Stanford University.

62.    Existing research shows that ranitidine interacts with nitrites and acids in the  chemical environment of the human stomach to form NDMA.  In *vitro tests* demonstrate that when ranitidine undergoes "nitrosation" (the process of a compound being converted into nitroso  derivatives) by interacting with gastric fluids in the human stomach, the by-product created is  dimethylamine ("DMA") – which is an amine present in ranitidine itself.  When DMA is  released, it can be nitrosated even further to form NDMA, a secondary N-nitrosamine.

63.    Moreover, in addition to the gastric fluid mechanisms investigated in the scientific  literature, Valisure identified a possible enzymatic mechanism for the liberation of    ranitidine's    DMA    group    via    the    human    enzyme    dimethylarginine dimethylaminohydrolase ("DDAH") which  can occur in other tissues and organs separate from the stomach.

64.    Liberated DMA can lead to the formation of NDMA when exposed to nitrite present on the ranitidine molecule, nitrite freely circulating in the body, or other potential pathways, particularly in weak acidic conditions such as that in the kidney or bladder. The   original scientific paper detailing the discovery of the DDAH enzyme in 1989 specifically   comments on the propensity of DMA to form NDMA: "This report also provides a useful  knowledge for an understanding of the endogenous source of dimethylamine as a precursor of a potent carcinogen, dimethylnitrosamine [NDMA]."[15]

65.    In Figure 3, below, computational modelling demonstrates that ranitidine (shown  in green) can readily bind to the DDAH-1 enzyme (shown as a cross-section in grey) in a manner  similar to the natural substrate of DDAH-1 known as asymmetric dimethylarginine ("ADMA,"  shown in blue).

---

[15] Ogawa et al, *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney*, 264 *J. BIO. CHEM.* 17, 10205-10209 (1989).

**Figure 3 – Computational Modelling of Ranitidine Binding to DDAH-1 Enzyme**



66.   These results indicate that the enzyme DDAH-1 increases formation of NDMA in  the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene is  useful for identifying organs most susceptible to this action.

67.   Figure 4 below, derived from the National Center for Biotechnology Information,  illustrates the expression of the DDAH-1 gene in various tissues in the human body.

**Figure 4 – Expression levels of DDAH-1 enzyme by Organ**



68.     DDAH-1 is most strongly expressed in the kidneys but also broadly distributed  throughout the body, such as in the liver, prostate, stomach, bladder, brain, colon, and prostate.  This offers both a general mechanism for NDMA formation in the human body from ranitidine  and specifically raises concern for the effects of NDMA on numerous organs, including the  bladder.

69.     In addition to the aforementioned *in vitro* studies that suggest a strong connection  between ranitidine and NDMA formation, *in vivo* clinical studies in living animals add further  weight to concern over this action and overall potential carcinogenicity.  A study published in the  journal *Carcinogenesis* in 1983 titled "Genotoxic effects in rodents given high oral doses of   ranitidine and sodium nitrite" specifically suspected the carcinogenic nature of ranitidine in  combination with nitrite.  The authors of this study concluded: "Our experimental findings have  shown that simultaneous oral administration in rats of high doses of ranitidine and NaNO2 [nitrite] can produce DNA fragmentation either in liver or in gastric mucosa."[16]

---

[16] Brambilla et al., *Genotoxic effects in rodents given high oral doses of ranitidine and sodium*

70.     The human data, although limited at this point, is even more concerning.  A study  completed and published in 2016 by Stanford University observed that healthy individuals, both  male and female, who ingested Zantac 150 mg tablets produced roughly 400 times elevated  amounts of NDMA in their urine (over 47,000 ng) in the proceeding 24 hours after ingestion.[17]

71.     Likely due to the perceived high safety profile of ranitidine, very few epidemiological studies have been conducted on this drug.

72.     A 2004 study published by the National Cancer Institute investigated 414 cases of  peptic ulcer disease reported in 1986 and followed the individual cases for 14 years.[18]   One of the  variables investigated by the authors was the patients' consumption of a prescription antacid,  either Tagamet (cimetidine) or Zantac (ranitidine).  The authors concluded that "[r]ecent use of  ulcer treatment medication (Tagamet and Zantac) was also related to the risk of bladder cancer,  and this association was independent of the elevated risk observed with gastric ulcers."  Specifically, the authors note that "N-Nitrosamines are known carcinogens, and nitrate ingestion  has been related to bladder cancer risk."  NDMA is among the most common of the N-Nitrosamines.

73.     A 1982 clinical study in rats compared ranitidine and cimetidine exposure in  combination with nitrite.  When investigating DNA fragmentation in the rats' livers, no effect  was observed for cimetidine administered with nitrite, but ranitidine administered with nitrite resulted in a significant DNA fragmentation.[19]

_nitrite_, 4 CARCINOGENESIS 10, 1281-1285 (1983).

[17] Zeng et al, _Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine_, 37 CARCINOGENESIS 625-634 (2016).

[18] Michaud et al, _Peptic ulcer disease and the risk of bladder cancer in a prospective study of  male health professionals_, 13 CANCER EPIDEMIOL BIOMARKERS PREV. 2, 250-254 (2004).

[19] Brambilla et al, _Genotoxic Effects of Drugs: Experimental Findings Concerning Some  Chemical Families of Therapeutic Relevance_, Nicolini C. (eds) Chemical Carcinogenesis. NATO  Advanced

74.     Investigators at Memorial Sloan Kettering Cancer Center are actively studying  ranitidine to evaluate the extent of the public health implications of these findings.  Regarding  ranitidine, one of the investigators commented: "A potential link between NDMA and ranitidine  is concerning, particularly considering the widespread use of this medication. Given the known  carcinogenic potential of NDMA, this finding may have significant public health implications[.]"

## IV.     Defendants Knew of the NDMA Defect but Failed to Warn or Test

75.     During the time that Defendants manufactured and sold Zantac in the United  States, the weight of scientific evidence showed that Zantac exposed users to unsafe levels of   NDMA.  Defendants failed to disclose this risk to consumers on the drug's label—or through any  other means—and Defendants failed to report these risks to the FDA.

76.     Going back as far as 1981, two years before Zantac entered the market, research  showed elevated rates of NDMA, when properly tested.  This was known or should have been  known by Defendants.

77.     Defendants concealed the Zantac–NDMA link from consumers in part by not  reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit  citizen petitions) to bring new information about an approved drug like Zantac to the agency's  attention.

78.     Manufacturers of an approved drug are required by regulation to submit an annual  report to the FDA containing, among other things, new information regarding the drug's safety pursuant to 21 C.F.R. § 314.81(b)(2):

> The report is required to contain . . . [a] brief summary of significant

_____

Study Institutes Series (Series A: Life Sciences), Vol 52. Springer, Boston, MA  (1982).

new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

79.     "The manufacturer's annual report also must contain copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product." 21 C.F.R. § 314.81(b)(2)(v).

80.     Defendants ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety or labeling of Zantac.

81.     Defendants never provided the relevant studies to the FDA, nor did they present to the FDA with a proposed disclosure noting the link between ranitidine and NDMA.

82.     In a 1981 study published by GSK, the originator of the ranitidine molecule, the metabolites of ranitidine in urine were studied using liquid chromatography.[20] Many metabolites were listed, though there is no indication that NDMA was looked for. Plaintiffs believe this was intentional—a gambit by the manufacturer to avoid detecting a carcinogen in their product.

83.     By 1987, after numerous studies raised concerns over ranitidine and cancerous nitroso compounds (discussed previously), GSK published a clinical study

---

[20] Carey et al, *Determination of ranitidine and its metabolites in human urine by reversed-phase ion-pair high-performance liquid chromatography*, 255 J. CHROMATOGRAPHY B: BIOMEDICAL SCI. & APPL. 1, 161-168 (1981).

specifically investigating gastric contents in human patients and N-nitroso compounds.[21] This study  specifically indicated that there were no elevated levels of N-nitroso compounds (of which  NDMA is one).  However, the study was rigged to fail.  It used an analytical system called a  "nitrogen oxide assay" for the determination of N-nitrosamines, which was developed for  analyzing food and is a detection method that indirectly and non-specifically measures N-nitrosamines.  Furthermore, in addition to this approach being less accurate, GSK also removed  all gastric samples that contained ranitidine out of concern that samples with ranitidine would  contain "high concentrations of N-nitroso compounds being recorded."  So, without the chemical  being present in any sample, any degradation into NDMA could not, by design, be observed. Again, this spurious test was intentional and designed to mask any potential cancer risk.

84.    There are multiple alternatives to Zantac that do not pose the same risk, such as   Cimetidine (Tagamet), Famotidine (Pepcid), Omeprazole (Prilosec), Esomeprazole (Nexium),   and Lansoprazole (Prevacid).

**V.      Statement of Plaintiff's Injuries**

85.    Plaintiff ingested Zantac from approximately 2000 through 2015 and was ultimately diagnosed with colorectal cancer in 2014.

86.    Based on prevailing scientific evidence, exposure to Zantac (and the attendant  NDMA) can cause cancer in humans.

87.    Plaintiff's cancer was caused by ingestion of Zantac. Plaintiff, as a direct and proximate result of his use of the Zantac, suffered severe mental and physical pain and

---

[21] Thomas et al, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents*, 6 *GUT*. Vol. 28, 726-738 (1987).

economic loss.

88.     As a proximate result of Plaintiffs' acts and/or omissions, Plaintiff suffered the injuries described hereinabove due to his ingestion of the Zantac.   Plaintiff accordingly seeks damages associated with these injuries.

89.     Had any Defendant warned Plaintiff that Zantac could lead to exposure to NDMA  or, in turn, cancer, Plaintiff would not have taken Zantac.

**VI.      Exemplary / Punitive Damages Allegations**

90.     Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice.  Defendants were fully aware of the safety risks of Zantac,  particularly the carcinogenic potential of Zantac as it transforms into NDMA within the chemical  environment of the human body.   Nonetheless, Defendants deliberately crafted their label,  marketing, and promotion to mislead consumers.

91.     This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing consumers that Zantac was harmless to  humans, and that full disclosure of the true risks of Zantac would limit the amount of money  Defendants would make selling Zantac. Defendants' object was accomplished not only through  its misleading label, but through a comprehensive scheme of selective misleading research and   testing, false advertising, and deceptive omissions as more fully alleged throughout this pleading.  Plaintiff was denied the right to make an informed decision about whether to purchase and use  Zantac, knowing the full risks attendant to that use.  Such conduct was done with conscious  disregard of Plaintiff's rights.

92.     Accordingly, Plaintiff requests punitive damages against Defendants for the harms caused to Plaintiff.

## TOLLING OF STATUTE OF LIMITATIONS AND ESTOPPEL

93.     Within the time period of any applicable statute of limitations, Plaintiff could  have discovered through the exercise of reasonable diligence that exposure to Zantac is injurious  to human health.

94.     Plaintiff could not have discovered nor have known of facts that would cause a reasonable  person to suspect the risk associated with the use of Zantac, nor would a reasonable and diligent  investigation by the Plaintiff have disclosed that Zantac would cause Plaintiff's illnesses.

95.     The expiration of any applicable statute of limitations has been equitably tolled by  reason of Defendants' misrepresentations and concealment.  Through affirmative  misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks  associated with use of Zantac.

96.     As a result of Defendants' actions, Plaintiff could not reasonably have known or  learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein  and/or that those risks were the direct and proximate result of Defendants' acts and/or omissions.

97.     Defendants are stopped from relying on any statute of limitations because of  their concealment of the truth regarding the safety of Zantac.  Defendants had a duty to disclose  the true character, quality and nature of Zantac because this was non-public information over   which Defendants continue to have control.  Defendants knew this information was not  available to Plaintiff, Plaintiff's medical providers and/or health facilities, yet Defendants failed   to disclose the information to the public, including Plaintiff.

98.     Defendants had the ability to and did spend enormous amounts of money

in furtherance of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiff and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on Defendants' representations.

## CAUSES OF ACTION

### COUNT I:  STRICT LIABILITY – DESIGN DEFECT

99.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

100.    Plaintiff brings this strict liability claim against Defendants (including Defendants DOES 1-100) for defective design.

101.    At all relevant times, Defendants (including Defendants DOES 1-100) engaged in the business of testing, developing,  designing, manufacturing, marketing, selling, distributing, and promoting Zantac products,  which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby  placing Zantac products into the stream of commerce.  These actions were under the ultimate  control and supervision of Defendants.  At all relevant times, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed,  sold, and distributed the Zantac products used by Plaintiff, as described herein.

102.    At all relevant times, Defendants' Zantac products were manufactured, designed,  and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use  by or exposure to the public, including Plaintiff.

103.    At all relevant times, Defendants' Zantac products reached the intended

consumers, handlers, and users or other persons coming into contact with these products within this judicial district and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants (including Defendants DOES 1-100). At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Zantac products within this judicial district and aimed at a consumer market within this judicial district. Defendants were at all relevant times involved in the retail and promotion of Zantac products marketed and sold in this judicial district.

104.   Defendants' Zantac products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the control of Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

105.   Defendants' Zantac products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

106.   At all relevant times, Defendants (including Defendants DOES 1-100) knew or had reason to know that Zantac products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

107.   Therefore, at all relevant times, Defendants' Zantac products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation,

in one or more of the following ways:

a.  When placed in the stream of commerce, Defendants' Zantac products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.  When placed in the stream of commerce, Defendants' Zantac products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c.  When placed in the stream of commerce, Defendants' Zantac products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d.  Defendants did not sufficiently test, investigate, or study its Zantac products and, specifically, the ability for Zantac to transform into the carcinogenic compound NDMA within the human body;

e.  Exposure to Zantac products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the drug;

f.  Defendants knew or should have known at the time of marketing Zantac products that exposure to Zantac could result in cancer and other severe illnesses and injuries;

g.  Defendants did not conduct adequate post-marketing surveillance of its Zantac products; and

h.    Defendants could have employed safer alternative designs and formulations.

108.    Plaintiff used and was exposed to Defendants' Zantac products without knowledge of Zantac's dangerous characteristics.

109.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendants' Zantac products in an intended or reasonably foreseeable manner without knowledge of Zantac's dangerous characteristics.

110.    Plaintiff could not reasonably have discovered the defects and risks associated with Zantac products before or at the time of exposure due to the Defendants' suppression or obfuscation of scientific information linking Zantac to cancer.

111.    The harm caused by Defendants' Zantac products far outweighed their benefit, rendering Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Zantac products were and are more dangerous than alternative products, and Defendants could have designed Zantac products to make them less dangerous. Indeed, at the time Defendants designed Zantac products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

112.    At the time Zantac products left Defendants' control ((including that of Defendants DOES 1-100), there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Zantac products. For example, the Defendants could have added ascorbic acid (Vitamin C) to each dose of Zantac, which is known to scavenge nitrites and reduce the ability of the body to

recombine ranitidine into NDMA.[22]

113.   Defendants' (including Defendants DOES 1-100) defective design of Zantac products was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of the Zantac products, including Plaintiff.

114.   Therefore, as a result of the unreasonably dangerous condition of their Zantac products, Defendants (including Defendants DOES 1-100) are strictly liable to Plaintiff.

115.   The defects in Defendants' (including Defendants DOES 1-100) Zantac products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained injuries.

116.   Defendants' (including Defendants DOES 1-100) conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Zantac products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

117.   As a direct and proximate result of Defendants (including Defendants DOES 1-100) placing its defective Zantac products into the stream of commerce, and the resulting injuries, Plaintiff was injured and sustained pecuniary loss including general damages in a sum which exceeds the jurisdictional minimum of this Court.

---

[22] *See, e.g.*, Vermeer, et al., *Effect of ascorbic acid and green tea on endogenous formation of N nitrosodimethylamine and N-nitrosopiperidine in humans.* 428 MUTAT. RES., FUNDAM. MOL. MECH. MUTAGEN. 353–361 (1999); Garland et al., *Urinary excretion of nitrosodimethylamine and nitrosoproline in humans: Interindividual and intraindividual differences and the effect of administered ascorbic acid and α-tocopherol*, 46 CANCER RESEARCH 5392–5400 (1986).

118.   As a proximate result of Defendants (including Defendants DOES 1-100) placing its defective Zantac products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff has suffered great mental anguish and other personal injury and damages.

119.   WHEREFORE, Plaintiff respectfully requests this Court to enter judgment against Defendants (including Defendants DOES 1-100) for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II:  STRICT LIABILITY – FAILURE TO WARN

120.   Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

121.   Plaintiff brings this strict liability claim against Defendants (including Defendants DOES 1-100) for failure to warn.

122.   At all relevant times, Defendants (including Defendants DOES 1-100) engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac products which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Zantac and NDMA. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold Zantac and other ranitidine formulations within this judicial district and aimed at a consumer market. Defendants were at all relevant times involved in the retail and promotion of Zantac products marketed and sold in in this judicial district.

123.   Defendants (including Defendants DOES 1-100) researched, developed,

designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Zantac products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Zantac products.

124.    At all relevant times, Defendants (including Defendants DOES 1-100) had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Zantac products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiff of dangers associated with Zantac. Defendants, as a manufacturer, seller, or distributor of pharmaceutical medication, are held to the knowledge of an expert in the field.

125.    At the time of manufacture, Defendants (including Defendants DOES 1-100) could have provided the warnings or instructions regarding the full and complete risks of Zantac products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

126.    At all relevant times, Defendants (including Defendants DOES 1-100) failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' Zantac products, including Plaintiff.

127.    Even though Defendants (including Defendants DOES 1-100) knew or should have known that Zantac posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The

dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting Zantac, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as Plaintiff.

128.   Defendants (including Defendants DOES 1-100) knew or should have known their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to its products. Defendants have wrongfully concealed information concerning the dangerous nature of Zantac and the potential for ingested Zantac to transform into the carcinogenic NDMA compound, and further, have made false and/or misleading statements concerning the safety of Zantac products.

129.   At all relevant times, Defendants' Zantac products reached the intended consumers, handlers, and users or other persons coming into contact with these products within this judicial district and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

130.   Plaintiff was exposed to Defendants' Zantac products without knowledge of their dangerous characteristics.

131.   At all relevant times, Plaintiff used and/or was exposed to the use of Defendants' Zantac products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

132.   Plaintiff could not have reasonably discovered the defects and risks

associated with Zantac products prior to or at the time of Plaintiff consuming Zantac. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

133.   Defendants (including Defendants DOES 1-100) knew or should have known that the minimal warnings disseminated with their Zantac products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

134.   The information Defendants (including Defendants DOES 1-100) did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection.  Instead, Defendants disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Zantac; continued to aggressively promote the efficacy of its products, even after they knew or should have known of the unreasonable risks from use and/or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting Zantac.

135.   This alleged failure to warn is not limited to the information contained on Zantac's labeling.  Defendants were able, in accordance with federal law, to comply with relevant state law by disclosing the known risks associated with Zantac through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources.  But the Defendants did not disclose these known

risks through any  medium.

136.   Defendants (including Defendants DOES 1-100) are liable to Plaintiff for injuries caused by their negligent or willful  failure, as described above, to provide adequate warnings or other clinically relevant information  and data regarding the appropriate use of their products and the risks associated with the use of  Zantac.

137.   Had Defendants (including Defendants DOES 1-100) provided adequate warnings and instructions and properly  disclosed and disseminated the risks associated with their Zantac products, Plaintiff could have  avoided the risk of developing injuries and could have obtained or used alternative medication.

138.   As a direct and proximate result of Defendants (including Defendants DOES 1-100) placing defective Zantac products  into the stream of commerce, Plaintiff was injured and sustained pecuniary loss resulting and  general damages in a sum exceeding the jurisdictional minimum of this Court.

139.   As a proximate result of Defendants (including Defendants DOES 1-100) placing defective Zantac products into the  stream of commerce, as alleged herein, there was a measurable and significant interval of time  during which Plaintiff suffered great mental anguish and other personal injury and damages.

140.   WHEREFORE, Plaintiff respectfully requests this Court to enter judgment against Defendants (including Defendants DOES 1-100) for compensatory and punitive damages, together with interest, costs herein  incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III:  NEGLIGENCE

141.   Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

142.     Defendants (including Defendants DOES 1-100), directly or indirectly, caused Zantac products to be sold, distributed,  packaged, labeled, marketed, promoted, and/or used by Plaintiff.   At all relevant times,   Defendants registered, researched, manufactured, distributed, marketed and sold Zantac within    this judicial district and aimed at a consumer market within this district.

143.     At all relevant times, Defendants (including Defendants DOES 1-100) had a duty to exercise reasonable care in the   design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale,   and distribution of Zantac products, including the duty to take all reasonable steps necessary to   manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers  and users of the product.

144.     At all relevant times, Defendants (including Defendants DOES 1-100) had a duty to exercise reasonable care in the  marketing, advertisement, and sale of the Zantac products. Defendants' duty of care owed to  consumers and the general public included providing accurate, true, and correct information   concerning the risks of using Zantac and appropriate, complete, and accurate warnings   concerning the potential adverse effects of Zantac and, in particular, its ability to transform into   the carcinogenic compound NDMA.

145.     At all relevant times, Defendants (including Defendants DOES 1-100) knew or, in the exercise of reasonable care,  should have known of the hazards and dangers of Zantac and, specifically, the carcinogenic  properties of NDMA when Zantac is ingested.

146.     Accordingly, at all relevant times, Defendants (including Defendants DOES 1-100) knew or, in the exercise of  reasonable care, should have known that use of Zantac products could cause or be associated   with Plaintiff's injuries, and thus, create a

dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

147.    Defendants (including Defendants DOES 1-100) also knew or, in the exercise of reasonable care, should have known that users and consumers of Zantac were unaware of the risks and the magnitude of the risks associated with use of Zantac.

148.    As such, Defendants (including Defendants DOES 1-100) breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Zantac products, in that Defendants manufactured and produced defective Zantac which carries the potential to transform into the carcinogenic compound NDMA; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Zantac products because they knew the chemical posed serious health risks to humans.

149.    Defendants (including Defendants DOES 1-100) were negligent in their promotion of Zantac, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Zantac, including the internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Zantac in their promotional efforts, outside of the context of labeling.

150.    Despite their ability and means to investigate, study, and test the products

and to provide adequate warnings, Defendants (including Defendants DOES 1-100) failed to do so. Indeed, Defendants wrongfully concealed information and further made false and/or misleading statements concerning the safety and use of Zantac.

151. Defendants' negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Zantac products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Zantac while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of Zantac and the carcinogenic potential of NDMA as created in the human body as a result of ingesting Zantac, and, consequently, the risk of serious harm associated with human use of Zantac;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether Zantac products were safe for their intended consumer use;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Zantac products so as to avoid the risk of serious harm associated with the prevalent use of Zantac products;

e. Failing to design and manufacture Zantac products so as to ensure they were at least as safe and effective as other medications on the market intended to treat the same symptoms;

f.     Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use Zantac products;

g.     Failing to disclose to Plaintiff, users/consumers, and the general public that use of Zantac presented severe risks of cancer and other grave illnesses;

h.     Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiff and other consumers;

i.     Systematically suppressing and/or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Zantac products;

j.     Representing that their Zantac products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k.     Declining to make or propose any changes to Zantac products' labeling or other promotional materials that would alert consumers and the general public of the risks of Zantac;

l.     Advertising, marketing, and recommending use of the Zantac products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Zantac;

m.     Continuing to disseminate information to its consumers, which

indicates or implies  Defendants' Zantac products are not unsafe for regular consumer use; and

n.   Continuing the manufacture and sale of their products with the knowledge that the  products are and were unreasonably unsafe and dangerous.

152.   Defendants (including Defendants DOES 1-100) knew and/or should have known it was foreseeable consumers  such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care  in the manufacturing, marketing, labeling, distribution, and sale of Zantac.

153.   Plaintiff did not know the nature and extent of the injuries that could result from  the intended use of and/or exposure to Zantac.

154.   Defendants' (including Defendants DOES 1-100) negligence was the proximate cause of Plaintiff's injuries, i.e., absent  Defendants' negligence, Plaintiff would not have developed cancer.

155.   Defendants' (including Defendants DOES 1-100) conduct, as described above, was reckless.  Defendants regularly  risked the lives of consumers and users of their products, including Plaintiff, with full knowledge  of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff.  Defendants' reckless conduct  therefore warrants an award of punitive damages.

156.   As a direct and proximate result of Defendants (including Defendants DOES 1-100) placing defective Zantac products  into the stream of commerce, Plaintiff was injured and sustained pecuniary loss and general  damages in a sum exceeding the jurisdictional minimum of this Court.

157.    As a proximate result of Defendants (including Defendants DOES 1-100) placing defective Zantac products into the  stream of commerce, as alleged herein, there was a measurable and significant interval of time  during which Plaintiff suffered great mental anguish and other personal injury and damages.

158.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants (including Defendants DOES 1-100) for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IV:  BREACH OF EXPRESS WARRANTIES

159.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

160.    At all relevant times, Defendants (including Defendants DOES 1-100) engaged in the business of testing, developing,   designing, manufacturing, marketing, selling, distributing, and promoting Zantac products,   which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby   placing Zantac products into the stream of commerce in this judicial proceeding.   These actions were under the ultimate  control and supervision of Defendants.

161.    Defendants (including Defendants DOES 1-100) had a duty to exercise reasonable care in the research, development,  design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion,   sale, and release of Zantac products, including a duty to:

> a.    ensure its products did not cause the user unreasonably dangerous side  effects;
>
> b.    warn of dangerous and potentially fatal side effects; and

      c.    disclose adverse material facts, such as the true risks associated with the use of and exposure to Zantac, when making representations to consumers and the general public, including Plaintiff.

162.    As alleged throughout this pleading, the ability of Defendants to properly disclose those risks associated with Zantac is not limited to representations made on the labeling.

163.    At all relevant times, Defendants (including Defendants DOES 1-100) expressly represented and warranted to the purchasers of its products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Zantac products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendants advertised, labeled, marketed, and promoted Zantac products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Zantac products would conform to the representations.

164.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Zantac. Defendants (including Defendants DOES 1-100) knew and/or should have known that the risks expressly included in Zantac warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendants expressly represented that Zantac products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as consumer medication.

165.    The representations about Zantac, as set forth herein, contained and/or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

166.    Defendants (including Defendants DOES 1-100) placed Zantac products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of Zantac.

167.    Defendants (including Defendants DOES 1-100) breached the warranties referenced herein, addressed herein because, among other things, Zantac products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendants breached the warranties in the following ways:

      a.    Defendants represented through its labeling, advertising, and marketing materials that Zantac products were safe, and intentionally withheld and concealed information about the risks of serious injury associated with use of Zantac and by expressly limiting the risks associated with use within its warnings and labels; and

      b.    Defendants represented that Zantac products were safe for use and intentionally concealed information that demonstrated that Zantac, by transforming into NDMA upon human ingestion, had carcinogenic properties, and that Zantac products, therefore, were

not safer than alternatives available on the market.

168.    Plaintiff detrimentally relied on the express warranties and representations of Defendants concerning the safety and/or risk profile of Zantac in deciding to purchase the product. Plaintiff reasonably relied upon Defendants to disclose known defects, risks, dangers, and side effects of Zantac. Plaintiff would not have purchased or used Zantac had Defendants properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

169.    Defendants (including Defendants DOES 1-100) had sole access to material facts concerning the nature of the risks associated with its Zantac products, as expressly stated within their warnings and labels, and knew consumers and users such as Plaintiff could not have reasonably discovered the risks expressly included in Zantac warnings and labels were inadequate and inaccurate.

170.    Plaintiff had no knowledge of the falsity or incompleteness of Defendants' statements and representations concerning Zantac.

171.    Plaintiff used and/or was exposed to Zantac as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendants.

172.    Had the warnings, labels, advertisements, and/or promotional material for Zantac products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could or would have avoided the injuries complained of herein.

173.    As a direct and proximate result of Defendants' (including Defendants DOES 1-100) breach of express warranty, Plaintiff has sustained pecuniary loss and

general damages in a sum exceeding the jurisdictional  minimum of this Court.

174.    As a proximate result of Defendants' (including Defendants DOES 1-100) breach of express warranty, as alleged  herein, there was a measurable and significant interval of time during which Plaintiff suffered  great mental anguish and other personal injury and damages.

175.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment against Defendants (including Defendants DOES 1-100) for compensatory and punitive damages, together with interest, costs herein  incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT V:  BREACH OF IMPLIED WARRANTIES

176.    Plaintiff incorporates by reference every allegation set forth in preceding paragraphs as if fully stated herein.

177.    At all relevant times, Defendants (including Defendants DOES 1-100) engaged in the business of testing, developing,  designing, manufacturing, marketing, selling, distributing, and promoting Zantac products,  which were and are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Zantac products into the stream of commerce in this judicial district.

178.    Before the time Plaintiff used Zantac products, Defendants impliedly warranted to  its consumers, including Plaintiff, that Zantac products were of merchantable quality and safe  and fit for the use for which they were intended; specifically, as consumer medication.

179.    But Defendants (including Defendants DOES 1-100) failed to disclose that Zantac has dangerous propensities when  used as intended and that use of Zantac products carries an increased risk of developing severe  injuries, including Plaintiff's

injuries.

180.    Plaintiff was an intended beneficiary of the implied warranties made by Defendants to purchasers of its Zantac products.

181.    The Zantac products were expected to reach and did in fact reach consumers and  users, including Plaintiff, without substantial change in the condition in which they were  manufactured and sold by Defendants (including Defendants DOES 1-100).

182.    At all relevant times, Defendants (including Defendants DOES 1-100) were aware that consumers and users of its  products, including Plaintiff, would use Zantac products as marketed by Defendants, which is to  say that Plaintiff was a foreseeable user of Zantac.

183.    Defendants (including Defendants DOES 1-100)  intended that Zantac products be used in the manner in which Plaintiff, in fact, used them and which Defendants impliedly warranted to be of merchantable  quality, safe, and fit for this use, even though Zantac was not adequately tested or researched.

184.    In reliance upon Defendants' (including Defendants DOES 1-100) implied warranty, Plaintiff used Zantac as instructed  and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by  Defendants.

185.    Plaintiff could not have reasonably discovered or known of the risks of serious  injury associated with Zantac.

186.    Defendants (including Defendants DOES 1-100) breached their implied warranty to Plaintiff in that Zantac products  were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Zantac  has dangerous propensities when used as intended and can cause serious injuries, including those  injuries complained of herein.

187.    The harm caused by Defendants' (including Defendants DOES 1-100) Zantac products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

188.    As a direct and proximate result of Defendants' (including Defendants DOES 1-100) breach of implied warranty, Plaintiff has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

189.    As a proximate result of the Defendants' (including Defendants DOES 1-100) breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

190.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment against Defendants (including Defendants DOES 1-100) for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

191.    Plaintiff demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

192.    WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor and against the Defendants for:

a.    actual and/or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.    exemplary and punitive damages sufficient to punish and deter the Defendants and others from future wrongful practices;

      c.      pre-judgment and post-judgment interest;

      d.      costs including reasonable attorneys' fees, court costs, and other litigation  expenses; and

      e.      any other relief the Court may deem just and proper.

DATED:  February 10, 2020          Respectfully submitted,

          _/s/ PAIGE BOLDT_
          Paige Boldt
          New Jersey State Bar No. 52242013
          Mikal C. Watts
          (*Pro hac* anticipated)
          Alicia D. O'Neill
          (*Pro hac* anticipated)
          **WATTS GUERRA LLP**
          5726 W. Hausman Rd., Ste. 119
          San Antonio, Texas 78249
          Direct: (210) 447-0500
          Facsimile: (210) 447-0501
          pboldt@wattsguerra.com
          mcwatts@wattsguerra.com
          aoneill@wattsguerra.com

          **ATTORNEYS FOR PLAINTIFF**